**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

UNITED STATES OF AMERICA

vs.                                                                    Case No.: 3:15-cr-70-J-34MCR

ERICK ESTRADA-LOPEZ
_____

## OPINION OF THE COURT

**THIS CAUSE** came before the Court on Defendant's Motion for Judgment of Acquittal (Doc. No. 349; Acquittal Motion) filed on December 20, 2016, as well as Defendant's Motion for New Trial (Doc. No. 334; New Trial Motion), filed on November 28, 2016 (together, the Motions). Following a four day jury trial, on November 14, 2016, the jury returned a verdict finding Defendant Erick Estrada-Lopez (Estrada) guilty as to Count One of the Indictment (Doc. No. 1; Indictment). <u>See</u> Verdict Form (Doc. No. 317; Verdict). Specifically, the jury found Estrada guilty of "conspir[ing] to commit money laundering involving property represented to be the proceeds of specified unlawful activity, with the intent to conceal or disguise the nature, location, source, ownership, and control of the property believed to be the proceeds of the specified unlawful activity[,]" in violation of 18 U.S.C. §§ 1956(a)(3)(B) and (h). Verdict at 1; <u>see also</u> Indictment. In the Acquittal Motion, Estrada requests that the Court enter a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure (Rule(s)) "as the evidence is insufficient to sustain a conviction." <u>See</u> Acquittal Motion at 1. In the New Trial Motion, Estrada alternatively requests that the Court grant a new trial pursuant to Rule 33 "as it is required by the interests of justice." <u>See</u> New Trial Motion at 1. The Government filed responses in opposition to the Motions. <u>See</u> United States' Response to Defendant's Motion for

Judgment of Acquittal (Doc. No. 356; Acquittal Response); United States' Response to Defendant's Motion for New Trial (Doc. No. 347; New Trial Response).

On March 13, 2017, the Court scheduled a sentencing for Estrada and 7 others indicted along with him to begin on April 18, 2017, and continue through April 19, 2017. See Endorsed Order (Doc. No. 372). As the dates of the sentencings approached, the Court had determined that the Motions were due to be denied. But, due to the Court's heavy caseload, the Court had not yet finalized its written opinion setting forth the reasons for its decision. Not wanting to delay the sentencings of all defendants, the Court, instead, entered its order denying the Motions with the assurance that the entry of a reasoned opinion would follow.[1] Here, the Court provides that opinion.

## I.    Summary of the Arguments

In the Motions, Estrada advances a number of arguments in support of his request for a judgment of acquittal or a new trial. First, Estrada contends that a judgment of acquittal is warranted because the record evidence does not establish his knowledge that the funds used in the money laundering transaction at issue were represented to be proceeds of illegal activities. See Acquittal Motion at 2. In addressing this argument, the Government contends that Estrada "cherry-pick[ed]" testimony and evidence favorable to his position and "omit[ted]" testimony and evidence that refutes it. Acquittal Response at 3. Next, Estrada argues that the Court should grant a judgment of acquittal because the Government's trial evidence demonstrated – at best – that Estrada believed the funds in question to be the proceeds of the sale of marijuana, whereas the Indictment specifically charged Estrada with conspiracy to launder proceeds from the sale of MDMA, a different

---

[1]    At the sentencing hearing on April 19, 2017, counsel for Estrada consented to the Court proceeding with the sentencing of Estrada with the later entry of the written opinion on the Motions.

drug commonly known as "ecstasy." See Acquittal Motion at 12. To this point, the Government responds that it merely had to prove that the funds in question were, in fact, represented to be the proceeds of the sale of MDMA and that Estrada believed such funds to represent the proceeds of any unlawful activity enumerated by 18 U.S.C. § 1956(c)(7). See Acquittal Response at 14.

Alternatively, Estrada avers that a new trial is warranted because "the [G]overnment's key witnesses were impeached and the [G]overnment's case marked by uncertainties and discrepancies." New Trial Motion at 4. In response, the Government contends that inconsistent testimony regarding ancillary facts does not – under the circumstances – vitiate the witnesses' credibility, especially given that the evidence presented was "more than sufficient" to support the verdict. See New Trial Response at 3, 6. Estrada further maintains that the Court erred by giving a 'deliberate ignorance' jury instruction because the record evidence did not warrant it. See New Trial Motion at 4. In response to this argument, the Government contends that the evidence presented at trial was sufficient to support the Court's decision to instruct the jury on deliberate ignorance inasmuch as the record evidence could support conviction under a theory of either actual knowledge or willful blindness. See New Trial Response at 8-9.

## II.   Discussion

### A.   Judgment of Acquittal

#### 1.   Standard

Rule 29 provides the Court with authority, where appropriate, to enter a judgment of acquittal following a guilty verdict. Rule 29(c)(2). A motion for judgment of acquittal under Rule 29 "is a direct challenge to the sufficiency of the evidence presented against the

defendant." United States v. Aibejeris, 28 F.3d 97, 98 (11th Cir. 1994); see also United States v. Ward, 197 F.3d 1076, 1079 (11th Cir. 1999) ("In considering a motion for the entry of judgment of acquittal under [Rule 29(c)], a district court should apply the same standard used in reviewing the sufficiency of the evidence to sustain a conviction."). In ruling on such a motion, a district court must "'determine whether, viewing all the evidence in the light most favorable to the Government and drawing all reasonable inferences and credibility choices in favor of the jury's verdict, a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt.'" United States v. Grigsby, 111 F.3d 806, 833 (11th Cir. 1997) (quoting United States v. O'Keefe, 825 F.2d 314, 319 (11th Cir. 1987)).

      **2.    Analysis**

In the Indictment, the Government alleged that Estrada, along with others, conspired "to conduct and attempt to conduct financial transactions . . . involving property represented to be the proceeds of specified unlawful activity, to wit: distribution of MDMA . . . with the intent to conceal or disguise the nature, location, source, ownership, and control of property believed to be the proceeds of specified unlawful activity," in violation of 18 U.S.C. §§ 1956(a)(3)(B) and (h). Indictment at 3. The conspiracy charge originated from a Government sting operation in which an undercover agent approached Estrada's associates to conduct money laundering transactions with funds which the agent represented to be proceeds of the sale of MDMA. See id. at 2. The Government alleged that, on or about December 13, 2012, Estrada conducted a money laundering transaction with Alex Rodriguez (Rodriguez), a co-conspirator, using these same funds. See id. at 6. Because the Government charged Estrada with conspiracy to commit money laundering,

as opposed to the substantive offense of money laundering itself, at trial the Government was required to prove beyond a reasonable doubt: "(1) an agreement between two or more persons to commit a money-laundering offense; and (2) knowing and voluntary participation in that agreement by the defendant."[2] <u>United States v. Castronuovo</u>, 649 Fed. Appx. 904, 911 (11th Cir. 2016) (quoting <u>United States v. Moran</u>, 778 F.3d 942, 962 (11th Cir. 2015)) (additional citations omitted). Notably, "no evidence of willfulness or specific intent is required [], and a conviction does not require proof of an overt act in furtherance of the conspiracy." <u>Id.</u>

In accordance with the foregoing, the Court instructed the jury as follows:

> Title 18 U.S.C. § 1956 makes it a Federal crime to knowingly engage in certain kinds of financial transactions commonly known as money laundering. A Defendant can be found guilty of this offense only if all the following facts are proved beyond a reasonable doubt:
>
> (1) the Defendant knowingly conducted or attempted to conduct a financial transaction;
>
> (2) the transaction or attempted transaction involved property that a law-enforcement officer represented as coming from a specified unlawful activity; and
>
> (3) the Defendant engaged in the transaction or attempted transaction with the intent to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity.
>
> In this case, the Government alleges that the property involved in the financial transaction was represented as coming from the distribution of MDMA, commonly known as "ecstasy," in violation of Title 21, United States Code Section 841(a)(1) and 841(b)(1)(C). Distribution of MDMA is a specified unlawful activity under the law.
>
> . . . .
>
> <u>In this case, Erick Estrada-Lopez is not charged with the substantive offense of money laundering. Instead, he is charged with conspiring to</u>

---

[2]    These elements are slightly different than those suggested by Estrada, <u>see</u> Acquittal Motion at 2, as Estrada discussed the elements of a conviction for the substantive offense of money laundering rather than the elements necessary for a conspiracy conviction under this statute.

- 5 -

engage in money laundering or transactions involving the proceeds of specific unlawful activity that violate 18 U.S.C. § 1956.

Conspiracy to engage in money laundering is a separate Federal crime.

. . . .

A Defendant can be found guilty of this crime only if all the following facts are proved beyond a reasonable doubt:

(1) two or more people agreed to try to accomplish a common and unlawful plan to violate 18 U.S.C. Section 1956; and

(2) the Defendant knew about the plan's unlawful purpose and voluntarily joined in it.

A person may be a conspirator even without knowing all the details of the unlawful plan or the names and identities of all the other alleged conspirators. If the Defendant played only a minor part in the plan but had a general understanding of the unlawful purpose of the plan – and voluntarily joined in the plan on at least one occasion – that is sufficient for you to find the Defendant guilty.

Court's Final Jury Instructions at 14-17 (Doc. No. 316; Jury Instructions) (emphasis added).

In essence, Estrada argues that his acquittal is warranted because – according to the language of the Indictment – "[t]he [G]overnment had the burden to prove beyond a reasonable doubt that the money given to [] Estrada . . . came from the sale of MDMA . . . ." Acquittal Motion at 14. Put differently, Estrada believes that the Government was required to prove that Estrada knew that the funds involved in the money laundering transaction were represented as coming from the sale of MDMA, and that it failed to do so, because he contends the record evidence demonstrates that Estrada was never informed of this fact by either the undercover agent or any of his co-conspirators. See id. at 12-13. Estrada further argues that, even when viewed in the light most favorable to the Government, the evidence only suggests that he may have believed the funds to have originated from Rodriguez' sale of marijuana. See id. at 12. In response, the Government contends that it "simply needed to prove that the money in fact was represented as coming

from [the proceeds of the sale of MDMA,]" and that it did not have to prove that Estrada was specifically aware of this fact so long as he believed the money to have originated from any statutorily-enumerated unlawful activity.  See Acquittal Response at 14 (emphasis in original).  To address Estrada's contentions in the most logical manner, the Court will first consider what the Government was required to prove with respect to the money laundering conspiracy offense, and then turn to the question of whether the evidence presented by the Government at trial was sufficient to sustain a conviction.

### a.      Proof of the Offense Charged

To convict Estrada of the money laundering conspiracy offense, the Government was required to prove that Estrada "knew of the 'essential nature of the plan' and agreed to do it."  See, e.g., United States v. Chandler, 388 F.3d 796, 806 (11th Cir. 2004) (quoting Blumenthal v. United States, 332 U.S. 539, 557 (1947)).  Because the Government did not present evidence that Estrada actually knew of the undercover agent's representation that the funds involved in the money laundering transaction were proceeds from the sale of MDMA, a point which the Government essentially concedes, Estrada avers that the jury erred in finding him guilty.  See Acquittal Motion at 12-13; Acquittal Response at 8, 14.  In support of this argument, Estrada cites to Chandler for the proposition that it is error for the grand jury to indict on one theory of illegal conduct and the Government to prosecute the case on another, entirely different theory.  See Chandler, 388 F.3d at 798.  While this legal principle is valid in the abstract, the Court finds Estrada's reliance on Chandler to be misplaced, as the two cases are entirely distinct factually.

In Chandler, the Eleventh Circuit overturned a conspiracy conviction because the Government charged a single conspiracy but presented evidence of multiple uncharged

conspiracies.  See id. at 811-813.  Notably, with regard to the overarching single conspiracy, the Government presented no proof that the "end of the line" defendants who represented themselves to be winning ticket holders had any knowledge that the "winning tickets" given to them to redeem had been obtained unlawfully.  Id. at 806-07.  In this regard, the court found that the Government failed to prove that the defendants knew of the "essential nature of the plan" and knowingly joined it.  Id. at 806.  As such, the conspiracy convictions could not stand.  See id. at 813.

Here, the Government charged, and at trial, presented proof of a single conspiracy to launder money represented to be the proceeds of specified unlawful activity – drug trafficking.  As such, Chandler is inapplicable.[3]

Estrada cites no Eleventh Circuit authority, and the Court found none, which discusses the unique issue presented by this case – namely, whether 18 U.S.C. § 1956(a)(3)(B) requires that co-conspirators believe that the money being laundered comes from the same specified unlawful activity here – the sale of MDMA as opposed to the sale of marijuana.  In addressing this issue, United States v. Stavroulakis, 952 F.2d 686 (2d Cir. 1992) is instructive.[4]  In Stavroulakis, the defendant was charged with conspiring to launder

---

[3]    Notably, "when an indictment includes language describing the statutory crime and additional language narrowing the charged crime to a subset of the statutory crime," a court must be sure to include the same narrowing language in the relevant jury instructions in order to avoid constructively amending the indictment.  Castronuovo, 649 Fed. Appx. at 920 (citations omitted).  If the narrowing language is omitted from the jury instructions, then the essential elements of the indictment are impermissibly broadened, and a constructive amendment occurs.  See id.  Here, the Government alleges with particularity in the Indictment that the funds involved in the money laundering transaction were specifically represented by an undercover Government agent as having come from the sale of MDMA.  See Indictment at 3.  However, each of the Jury Instructions relating to the money laundering conspiracy offense reference this same 'specified unlawful activity.'  See Jury Instructions at 12, 14.  Hence, although Estrada does not directly raise this issue in the Acquittal Motion, the Court nevertheless concludes that the relevant Jury Instructions did not constructively amend the Indictment.

[4]    The Government cites to another Second Circuit case, United States v. Maher, 108 F.3d 1513 (2d Cir. 1997), in support of its position.  See Acquittal Response at 11, 14.  However, a close reading of Maher reveals that that case primarily concerns a defendant charged with violating 18 U.S.C. § 1956(a)(1)(B)(i).

money alleged to be the proceeds of unlawful activity pursuant to 18 U.S.C. § 1956(a)(3)(B).  See id. at 688.  An undercover agent explicitly informed the defendant that the funds in question were proceeds of narcotics transactions.  Id.  The defendant then told his co-conspirator that the funds in question derived from gambling, ostensibly due to the latter's scruples about laundering narcotics money.  Id.  On appeal, the defendant argued that his conviction could not stand because there was no agreement on the 'essential nature of the plan' in light of these differing beliefs regarding the source of the funds in question.  Id. at 690.  In response, the court reasoned as follows:

> The issue can be distilled, therefore, to the question whether, as part of the "essential nature" of a conspiracy to launder unlawfully acquired money, it is necessary that the conspirators agree on where the unlawful money will come from.  We think not.  We hold that, so long as the unlawful source is proven to be one of the illegal activities enumerated in § 1956(c)(7), it is not essential that the conspirators agree on the same illegal activity.

> Section 1956 creates the crime of money laundering, and it takes dead aim at the attempt to launder dirty money.  Why and how that money got dirty is defined in other statutes.  Section 1956 does not penalize the underlying unlawful activity from which the tainted money is derived.  That the money is represented to be the proceeds of one of the listed, illegal sources is, of course, essential to culpability.  The statute, however, does not distinguish among these specified unlawful activities either in degrees of importance or levels of criminal culpability.  All the specified unlawful activities are clustered, almost willy-nilly, under a single definition section of the statute.  So long as the cash is represented to have come from any of these activities, a defendant is guilty of the substantive offense of money laundering.

> Defendant's argument would require us to accept that one who launders illegal gambling money has engaged in a course of conduct essentially different from that of someone who launders narcotics money.  Congress has made clear that concealing the source of illegal gambling proceeds is just as detrimental to society as concealing the source of narcotics money.  The crime is the same: money laundering; the particular

---

See id. at 1518.  Although that subsection also codifies a money laundering offense, it uses language which is materially different from that which is used in § 1956(a)(3)(B).  See id. at 1525.  As such, and although Maher cites Stavroulakis with approval, see id. at 1527, the Court accords Stavroulakis greater weight.

> underlying activity specified by Congress is a necessary, but ancillary,
> concern.

Id. at 691.  In reaching this conclusion, the court also noted that, at the time Congress added subsection (a)(3) to the money laundering statute, then-Senator Biden "emphasized that the purpose of this amendment was to enhance the ability of law-enforcement officers 'to obtain evidence necessary to convict money launderers.'" Id. at 691 (quoting 134 Cong. Rec. S17365 (daily ed. Nov. 18, 1988) (statement of Sen. Biden) (emphasis in original)). In the end, the court held that the 'essential nature of the plan' in a conspiracy to violate § 1956 is an agreement to launder money, regardless of its source, provided that the source is believed to be one of the specified unlawful activities enumerated in § 1956(c)(7).  See id. at 692.  In light of the similarities between Stavroulakis and the present case, the Court finds its reasoning to be persuasive.

Here, the Government presented evidence through the undercover agent that he informed Rodriguez that the funds involved in the money laundering transaction were proceeds from the sale of MDMA.  See Trial Transcript, Volume I (Doc. No. 339; Tr. Vol. I) at 26.  At the same time, the Government's evidence supported a finding that Estrada believed these funds to be from Rodriguez' sale of marijuana.  See infra § II(A)(2)(b) at 15-19 (discussing evidence probative of Estrada's belief).  Despite these differences, both Rodriguez and Estrada nevertheless believed the funds to be derived from the sale of controlled substances.  Pursuant to 18 U.S.C. § 1956(c)(7), 'specified unlawful activity' is defined in pertinent part as "any act or activity constituting an offense listed in § 1961(1) of this title."  18 U.S.C. § 1956(c)(7)(A).  18 U.S.C. § 1961(1), in turn, specifically lists "dealing in a controlled substance" as an enumerated offense.  18 U.S.C. § 1961(1)(A).  Notably, both marijuana and MDMA are classified as Schedule I controlled substances, the

distribution of which is prohibited under federal law.  See 21 U.S.C. § 812, Schedule I §§ (c)(1), (10); 21 U.S.C. § 841.  Following the reasoning of Stavroulakis, the Court concludes that – regardless of their differing beliefs regarding the specific drug being sold to generate the purported drug proceeds – the "essential nature" of the conspiracy involving Rodriguez and Estrada was to launder drug money.  Thus, having determined that the Government's evidence at trial did not vary from what was charged in the Indictment, the Court addresses Estrada's argument regarding the sufficiency of the evidence presented.

### b.    Sufficiency of the Evidence: Knowledge Element

Estrada contends that the evidence of Rodriguez' representations regarding the source of the laundered funds was legally insufficient to support his conviction.  See Acquittal Motion at 2.  Specifically, Estrada asserts that the evidence offered by the Government failed to prove "that [] Estrada knew that the funds represented [sic] by [] Rodriguez were from the proceeds of a specified unlawful activity."  Id.  This is so, in part, because of Estrada's contention that there was no agreement on the essential nature of the conspiracy due to his and Rodriguez' divergent beliefs about the source – MDMA vs. marijuana – of the laundered funds.  Although the Court determined that this argument is unavailing, it must still address whether the Government's evidence was nonetheless sufficient for a reasonable jury to find – beyond a reasonable doubt – that Estrada knew that the funds involved in the money laundering scheme were the proceeds of specified unlawful activity, here the sale of a controlled substance.

In the context of a money laundering conspiracy offense, a defendant's knowledge[5] of the unlawful source of the laundered funds can be demonstrated via evidence regarding

---

[5]    In a money laundering sting prosecution, the funds used in the underlying financial transaction(s) are not actually the proceeds of any unlawful activity, as they originate directly from the Government.  As such,

the representations made to the defendant concerning the funds and their source as well as the defendant's behavior in response to those representations. See, e.g., United States v. Starke, 62 F.3d 1374, 1381-83 (11th Cir. 1995); see also United States v. Prewett, 340 Fed. Appx. 639, 642 (11th Cir. 2009) (per curiam) (citation omitted). As for the representations themselves, the Eleventh Circuit has stated that a representation "encompasses a broader range of communication than specific statements," and as such, it is not necessary for a conspirator to recite the specific illegal source of the funds to the defendant, so long as the defendant is "made aware of circumstances from which a reasonable person would infer that the property was drug proceeds." See Starke, 62 F.3d at 1382. Notably, under this standard, the reasonable person is one "possessing the knowledge that the defendant possessed" at the time the transaction occurred. See id.

For example, in Starke, undercover agents posing as truckers initially approached the defendant about purchasing stolen consumer goods. See id. at 1376. After completing these transactions, the agents asked the defendant for help with "clean[ing] up some money and open[ing] up . . . a business." Id. at 1377. The defendant agreed to assist, noting that opening a business was a good idea because it would offer a legitimate explanation for having large amounts of cash, and also requested a ten percent fee for his services "because of the risk involved." See id. Although the defendant subsequently engaged in numerous transactions with the agents, the agents never explicitly told the defendant that the money involved was drug proceeds. See id. Even so, the record

---

it is technically improper to state that the defendant was required to have 'known' that the funds used were the proceeds of unlawful activity. See United States v. Nektalov, 461 F.3d 309, 314 (2d Cir. 2006). Instead, under the circumstances, 'belief' is sufficient. See id. At the same time, "belief is properly understood to be a part of knowledge[,]" because "knowledge is [] belief substantiated by veracity, [and] belief is tantamount to knowledge in the context of a sting operation." Id. at 314, 316. For this reason, the terms 'knowledge' and 'belief' can be used interchangeably when discussing the mens rea element of this portion of the money laundering conspiracy offense.

evidence included transcripts of conversations during which the agents told the defendant that they were starting to generate large amounts of cash, to which the defendant responded by offering advice as to how to "conduct themselves" and legitimize their business. See id. at 1383. Upon review, the Eleventh Circuit concluded that, "[a]lthough the agents did not explicitly tell [the defendant] that they were drug dealers, their appearance, actions, and words could convey that they were drug dealers and that the money they needed to launder was drug proceeds." Id. at 1382-83. Specifically, one of the agents testified that the hours he kept were indicative of a drug trafficker, as was the car he drove – a late model Jaguar trimmed in gold, and the watch another agent wore – a Rolex. Id. at 1383. He further testified to exhibiting a general aversion to law enforcement. Id. In other words, based on the overall context of the conversations, which were "filled with references and allusions to narcotics activity," the court determined that the agents had effectively communicated to the defendant that they needed assistance laundering the proceeds of drug sales. See id.[6] The court further concluded that the defendant's response to the agents indicated an awareness of the source of the funds. Id. at 1384 ("The evidence [] regarding Starke's behavior and interaction with the agents supports the conclusion that Starke believed the [a]gents' representations to be true.").

Conversely, in United States v. Awan, 966 F.2d 1415, 1417, 1420 (11th Cir. 1992), undercover agents engaged in a large-scale operation to identify Colombian cocaine

---

[6]     See also United States v. Kaufmann, 985 F.2d 884, 887-88, 892-93 (7th Cir. 1993) (determining that the evidence was sufficient to support a money laundering conspiracy conviction where a cooperating witness told the defendant that a marijuana dealer wanted to purchase a Porsche 911 for $40,000 in cash and that the dealer did not want his name on any of the paperwork involved in the transaction); United States v. Breque, 964 F.2d 381, 386-87 (5th Cir. 1992) (determining that the evidence was sufficient to support a money laundering conspiracy conviction where an undercover agent made "veiled references to drug dealing[,]" the parties discussed various money laundering techniques in the era of Miami Vice – a television show about narcotics dealing, and the defendants were paid a commission for their services).

traffickers and money launderers which eventually led them to connect with the defendant, a bank marketing officer. Although the agents periodically identified themselves as associates of the largest and most powerful Colombian drug dealers, the record evidence indicated that no one ever told the defendant that the funds deposited in his bank were drug related. See id. at 1434. Critically, the evidence also demonstrated that the defendant left a meeting with the agents prior to their discussion of secret codes used to facilitate the money laundering. See id. at 1435. Consequently, the Eleventh Circuit held that insufficient evidence existed for a reasonable jury to find that the defendant knew that the transactions in question involved 'dirty money,' and the court reversed the defendant's conviction. See id. at 1433, 1435. Similarly, in United States v. de Saad, No. 98-504(B), 2000 WL 35789499, at *1 (C.D. Cal. July 13, 2000), undercover agents engaged in a different operation also targeting individuals involved in laundering drug money. The agents met with a bank executive in Venezuela, who later referred them to the defendant, another executive at an American branch of the same bank. See id. At trial, the Government conceded that its agents never mentioned the words 'drugs' or 'narcotics' around the defendant, instead informing her that they "wished to move hot money that belonged to financially uneducated Colombians." Id. at *2 (internal quotations omitted). Following a trial in which the defendant was convicted, see id. at *4, the district court granted her motion for acquittal, reasoning in doing so that there was no indication that "hot money" was recognizable slang for drug proceeds. See id. at *9. Additionally, the court noted that – after being given a strong hint about the money's origin – the defendant's behavior changed, and "it appeared that [she] did not want to continue the relationship with the agents." Id. at *10.

In the present action, the Government produced witness testimony and evidence, including a transcript of Estrada's post-arrest interview, all of which supports the conclusion that Estrada knew or believed the source of the laundered funds to be from drug sales. Significantly, the Government presented the testimony of Rodriguez, the co-conspirator who had been explicitly informed by the undercover agent that the money being laundered was proceeds from the sale of MDMA. Tr. Vol. I at 26. Rodriguez testified that he informed Estrada that he wanted to make this money "usable" and "legal[,]" at which point he and Estrada negotiated a fee for Estrada's assistance. Id. at 47. Estrada argued at trial, and again in the Acquittal Motion, that this evidence was insufficient to establish Estrada's knowledge of the source of the funds because Rodriguez' testimony was not credible.[7] See generally Acquittal Motion at 5. In support of this argument, Estrada attempts to impeach the credibility of Rodriguez through Rodriguez' own post-arrest admission that he was the only one with knowledge that laundering of drug money was occurring. See Acquittal Motion at 5 (citing Tr. Vol. II at 145-46). However, as the Government indicates, Rodriguez later admitted at trial that he was lying during this interview to protect his co-conspirators. See Tr. Vol. II at 155-57. More importantly, for the purposes of ruling on Estrada's Motion for Judgment of Acquittal under Rule 29, "all credibility choices are made in the Government's favor." See United States v. Florez, 516 Fed. Appx. 790, 797 (11th Cir. 2013). As such, the Court assumes that the jury credited the relevant portions of Rodriguez' testimony.

---

[7] Indeed, according to the Acquittal Motion, the undercover agent testified at trial that Rodriguez told him to "keep their deal only between them." Acquittal Motion at 4. This language implies that Rodriguez did not want anyone else to know about the source of the funds. However, a careful review of the record indicates that the agent actually testified that Rodriguez said he didn't want the public knowing of their business. Trial Transcript, Volume II (Doc. No. 340; Tr. Vol. II) at 197.

Additionally, Rodriguez' testimony was corroborated by other sources. Although Estrada contends that the Government failed to "establish a meeting that would prove [] Estrada had knowledge of the proceeds coming from an illegal activity[,]" see Acquittal Motion at 6, co-conspirator Mollie Bass (Bass) testified that she overheard conversations between Rodriguez and Estrada where Estrada expressed a desire to launder money on his own in the hopes of receiving a larger fee for his services, see Tr. Vol. II at 32-33. Bass also mentioned that she was present when Estrada brought Rodriguez a cashier's check for approximately $40,000, and that she overheard conversations between Rodriguez and Estrada confirming Estrada's knowledge of Rodriguez' involvement with dealing marijuana. See id. Although Estrada maintains that this evidence was insufficient proof of his knowledge of the source of the laundered funds, the Government presented this evidence to the jury, and the jury was free to accept it.[8] Additionally, in his own post-arrest interview, Estrada acknowledged that his associates were involved with drugs, and that he had been approached about investing upwards of $10,000 in a drug operation. See Estrada May 28, 2015 Interview Transcript (Doc. No. 347-1; Estrada Interview) at 4-5, 6-7. He further admitted to learning of a particular incident where Rodriguez received a "big box" that was "full of marijuana." Id. at 12. Later, Estrada corroborated Bass' testimony by stating that he saw her with Rodriguez at a local entertainment venue, at which time he witnessed them "doing some bad business" involving both marijuana and ecstasy. See id. at 13-14. The Government presented evidence that, under these circumstances, Estrada agreed to

---

[8]     The jury was similarly free to credit the testimony of Cesar Salgado, Estrada's former business associate, which indicated Salgado was present for a conversation between Estrada and Rodriguez where Rodriguez' drug activity was discussed. See Trial Transcript, Volume III (Doc. No. 341; Tr. Vol. III) at 107; but see Tr. Vol. III at 109 (Salgado could not recall Estrada being present for a discussion of Rodriguez' involvement with the drug trade).

receive more than $40,000 in cash, "hold" it for Rodriguez for less than a day, deposit the money into his business bank account and later withdraw the funds in the form of a cashier's check to give back to Rodriguez. See Acquittal Response at 9 (citing Estrada Interview at 8); see also Tr. Vol. I at 48.[9]

Although the facts of the present case are not as straightforward as those where an undercover agent makes representations directly to the defendant, when taken together, the evidence presented by the Government at trial and recounted above was sufficient to support the jury's finding that Estrada possessed the requisite mens rea to be convicted. Much as the defendant in Starke was asked to "clean up" money for a fee, 62 F.3d at 1377, Estrada also received a fee after assisting Rodriguez with his request to make money "legal[,]" Tr. Vol. I at 47. Similar to Kaufmann, where the defendant accepted approximately $40,000 in cash from a purported marijuana dealer, 985 F.2d at 887-88, here Estrada received almost the same amount from a man who Estrada knew did "some bad business" involving marijuana, Estrada Interview at 13-14. In Breque, the undercover agents made only "veiled references" to drug dealing. 964 F.2d at 387. Here, Estrada had previously been told that Rodriguez received a large shipment of marijuana. Estrada Interview at 12. Indeed, unlike in Awan, 966 F.2d at 1417, and de Saad, 2000 WL 35789499, at *1, where the defendants were never made aware of the connection between the money being laundered and drugs, here the record contains evidence connecting Rodriguez – and consequentially his money – to drug trafficking, see supra. Thus, viewing the evidence in the light most favorable to the Government, as the Court must, the Court finds that the

---

[9]     In response to questioning by Government agents, Estrada later noted that this incident made him uncomfortable, implying that he at least suspected that he was engaging in wrongdoing by assisting Rodriguez. See Estrada Interview at 7-8.

Government produced evidence sufficient to allow a reasonable jury to find that Estrada knew of the unlawful source of the money being laundered and, as such, that he was guilty beyond a reasonable doubt as to Count One of the Indictment.

Notably, a money laundering conspiracy conviction also will be sustained in situations where the evidence is indicative of a high probability that the defendant was aware of the source of the laundered funds, yet the defendant consciously refrained from obtaining final confirmation in an effort to later deny guilty knowledge. See, e.g., United States v. Rivera, 944 F.2d 1563, 1570-71 (11th Cir. 1991); see also Nektalov, 461 F.3d at 314.[10]   Indeed, the Eleventh Circuit Court of Appeals has "consistently recognized deliberate ignorance of criminal activity as the equivalent of knowledge." United States v. Arias, 984 F.2d 1139, 1143 (11th Cir. 1993) (quoting United States v. Adair, 951 F.2d 316, 319 (11th Cir. 1992)) (internal quotation omitted).  In doing so the court cited with approval the Second Circuit Court of Appeals' application of deliberate ignorance in a criminal prosecution. See id. (citing United States v. Mang Sun Wong, 884 F.2d 1537, 1542 (2d Cir. 1989)).  The Second Circuit considered the application of deliberate ignorance in a money laundering case in Nektalov, 461 F.3d at 315.  There, an undercover agent and a cooperating witness explained to the defendants – owners of a local jewelry store – that "product" was being brought into the United States from Colombia and sold for cash in small denominations "in the streets." Id. at 312.  The agent and his accomplice then requested assistance converting the proceeds of these sales into gold and diamonds to be returned to Colombia via a network of couriers. See id.  At trial, the named defendant

---

[10]     The Court addresses the issue of 'deliberate ignorance' at this juncture solely to provide a comprehensive treatment of the issue under review.  The Court addresses Estrada's objection to the Court's decision to give the deliberate ignorance jury instruction more fully in the portion of this Order dedicated to the New Trial Motion.  See infra § II(B)(2)(b) at 23-27.

denied knowledge that the funds were coming from drug traffickers, but he was convicted anyway.  See id. at 313.  On appeal, the Second Circuit concluded that "[a] jury rationally could find beyond a reasonable doubt given the circumstances of the transactions in the context of [the defendant's prior dealings with the cooperating witness], together with [] statements hinting at the source of the cash and the[] unambiguous intention to transport the gold and diamonds to Colombia," that the named defendant either knew that the funds were proceeds of narcotics trafficking, or that he strongly suspected as much and deliberately avoided asking questions to confirm his suspicions.  Id. at 317.  Even assuming, arguendo, that the jury credited Estrada's post-arrest statement that he was unaware of the actual source of the money, see Estrada Interview at 8, a reasonable jury could nevertheless have concluded based on the circumstances that Estrada deliberately avoided learning of the source of the funds.  See Nektalov, 461 F.3d at 312-13, 317 (determining, based on an analysis of all relevant circumstances, that a reasonable jury could have convicted the defendant on a theory of deliberate ignorance).  This is especially true in light of Estrada's admission that, although he knew his associates were involved in "bad things[,]" he "[did not] know what they did behind [his] back."  See id. at 4-5.

For all of the foregoing reasons, the Court has denied Estrada's Motion for Judgment of Acquittal.

**B.    New Trial**

**1.    Standard**

Rule 33(a) provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."[11]  Although motions for

---

[11]    As the Eleventh Circuit recognized, there are two grounds for granting a new trial under Rule 33: "interest of justice" and newly discovered evidence.  See United States v. Hall, 854 F.2d 1269, 1270 (11th

a new trial are disfavored, see United States v. Williams, 146 Fed. Appx. 425, 434 (11th Cir. 2005), the "interest of justice" standard is broad, and the trial court is vested with substantial discretion in determining whether to grant such a motion, see United States v. Vicaria, 12 F.3d 195, 198 (11th Cir. 1994); United States v. Martinez, 763 F.2d 1297, 1312 (11th Cir. 1985). Thus, the court considers "whether the verdict must be set aside 'in the interest of justice.'" United States v. Green, 275 Fed. Appx. 898, 899 (11th Cir. 2008) (internal quotations omitted); see also Vicaria, 12 F.3d at 198; Hall, 854 F.2d at 1271 (concluding that the trial "court has very broad discretion in deciding whether there has been a miscarriage of justice"); Martinez, 763 F.2d at 1312.

## 2. Analysis

Here, Estrada asserts two central reasons why the Court should grant him a new trial: (1) the weight of the evidence favors it; and (2) the Court erred in instructing the jury regarding 'deliberate ignorance' because the evidence did not warrant such an instruction. See generally New Trial Motion; see also supra § I. Upon consideration of the arguments presented, the Court has concluded that Estrada failed to show that he is entitled to a new trial or that the interests of justice demand that a new trial be granted in this case.

## a. Weight of the Evidence

When a defendant challenges the weight of the evidence in a motion for a new trial, the court "need not view the evidence in the light most favorable to the verdict" and "[i]t may weigh the evidence and consider the credibility of witnesses." Martinez, 763 F.2d at 1312; see also Green, 275 Fed. Appx. at 900; United States v. McMahon, No.

---

Cir. 1988). In this case, the only ground that could potentially be implicated in the New Trial Motion is the "interest of justice." See generally New Trial Motion.

8:04-cr-348-T-24TGW, 2007 WL 57778, at *1 (M.D. Fla. Jan. 5, 2007). Yet, "'[t]he court may not reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable.'" <u>Green</u>, 275 Fed. Appx. at 900 (<u>quoting</u> <u>Martinez</u>, 763 F.2d at 1312-13). Indeed, "[f]or a court to set aside the verdict, '[t]he evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand.'" <u>Id.</u> (<u>quoting</u> <u>Martinez</u>, 763 F.2d at 1313). Motions for a new trial based on the weight of the evidence are to be granted "'sparingly and with caution,' only in 'exceptional cases.'" <u>Id.</u> (<u>quoting</u> <u>Martinez</u>, 763 F.2d at 1313).

Estrada contends that it was a "miscarriage of justice" that he was convicted because the Government's key witnesses were impeached and their testimony marked by "uncertainties and discrepancies." New Trial Motion at 4. By way of example, Estrada takes issue with the fact that different witnesses testified to Estrada accepting different dollar amounts as a fee for assisting Rodriguez with the money laundering enterprise. <u>See</u> <u>id.</u> at 3. In particular, one witness testified inconsistently as to the amount of the fee, while another contended that no fee was ever paid. <u>See</u> <u>id.</u> Although Estrada accurately identifies these discrepancies, the Government notes that Rodriguez – its key witness with respect to this issue – consistently stated that he paid Estrada some amount of money for his role in the money laundering conspiracy. <u>See</u> New Trial Response at 3. Estrada also maintains that Bass' testimony indicating that Estrada wired the laundered money overseas was rendered incredible by the Government's direct evidence demonstrating that Estrada returned the funds in question directly to Rodriguez via a cashier's check. <u>See</u> New Trial Motion at 3-4. To this point, the Government responds that Bass later clarified that she only believed that she knew what would happen to the

money after Estrada gave it to Rodriguez.  See New Trial Response at 7.  Indeed, Bass testified: "My understanding of what I was told was that [Rodriguez] was going to be sending [the money] overseas, just like all the money we had sent."  Tr. Vol. III at 83.[12] Nevertheless, she testified unequivocally that Estrada brought Rodriguez a check for $40,000 in her presence at the massage parlor and that this check was in exchange for cash that Rodriguez gave Estrada.  Tr. Vol. III at 32-33.

Identifying the various discrepancies, Estrada argues that the verdict cannot stand and a new trial should be granted.  In doing so, Estrada compares his case to that of United States v. Hurley, 281 F. Supp. 443, 451 (D. Conn. 1968), where the court granted a defendant's motion for a new trial.  In Hurley, the defendant was charged with transporting stolen goods, an offense which requires a finding of criminal intent.  See id. at 446-47.  In considering the defendant's motion for a new trial, the court discussed discrepancies in the testimony of an accomplice regarding the amount of the fee offered to the defendant for his assistance with transporting the stolen property.  See id. at 449. While the discrepancies were concerning, as the accomplice's proffered explanations were "vague" and "confusing[,]" they were not enough – standing alone – for the court to set aside the verdict and grant a new trial.  Id.  Rather, the court also considered the testimony of a government agent whose interactions with the defendant were a "prime indication of [the defendant's] intent."  Id. at 450.  Significantly, the defendant later introduced "incontrovertible documentary evidence" supporting his testimony and

---

[12]    Bass testified to directly observing Estrada give Rodriguez the $40,000 check, but apparently believed that Rodriguez was going to send the funds Estrada gave him overseas in order to launder them. In reality, however, Estrada had already completed the process of laundering the money given to him by Rodriguez when he returned the money to Rodriguez in the form of a cashier's check.

discrediting that of the government agent.  Id.  In light of all of this evidence, the court concluded that a new trial was warranted.  Id. at 451.

Here, conversely, Estrada failed to present any incontrovertible evidence of any kind to discredit or otherwise refute the testimony of any of the Government's witnesses. Instead, he focuses on inconsistent testimony regarding two specific facts, neither of which are critical to a determination of his guilt.  Because the discrepancies identified by Estrada concern ancillary aspects of the witness' testimony, and not evidence which was critical to prove a key element of the Government's case, Estrada's reliance on Hurley is misplaced.  Additionally, "[b]ecause the explanations for the discrepancies are plausible and a reasonable factfinder could credit them, [t]his testimony was not so incredible as to preponderate heavily against the verdict."  United States v. Stevens, 277 Fed. Appx. 898, 901 (11th Cir. 2008) (per curiam).  While the Court is not bound by the jury's determination and may weigh the evidence and consider the credibility of the witnesses, it may not "set aside the verdict simply because it feels some other result would be more reasonable." United States v. Hernandez, 433 F.3d 1328, 1336 (11th Cir. 2005) (quoting Martinez, 763 F.2d at 1313-14).  Where, as here, the jury's verdict is reasonable and the evidence does not heavily preponderate against it, a new trial is not appropriate.  See id. at 1336-37. Thus, the Court has determined that Estrada's request for a new trial on this basis is denied.

### b.    Deliberate Ignorance Jury Instruction

Next, Estrada contends that a new trial is necessary because a deliberate ignorance instruction was unwarranted in this case.  New Trial Motion at 6.  In considering a motion for a new trial on the grounds of an erroneous jury instruction, the instruction

must be examined to determine whether it "adequately [presents] the issues and the law to jurors." United States v. Hewes, 729 F.2d 1302, 1316 (11th Cir. 1984). An instruction will give rise to error only where "the Court finds that the issues of law were presented inaccurately, the charge included crimes not contained in the indictment, or the charge improperly guided the jury in such a substantial way as to violate due process." Arias, 984 F.2d at 1139 (citing United States v. Turner, 871 F.2d 1574, 1578 (11th Cir. 1989)). Indeed, an erroneous instruction will entitle a defendant to a new trial "only when a reasonable likelihood exists that the jury applied the instruction in an improper manner." United States v. Leonard, 138 F.3d 906, 910 (11th Cir. 1998).

In support of his contention that the deliberate ignorance instruction was improper, Estrada asserts that the Government's evidence demonstrated that he had no knowledge that the funds involved in the money laundering transaction were represented to be proceeds of the sale of MDMA.[13] New Trial Motion at 6. Estrada further notes that the use of such an instruction is improper when "the evidence only points to either actual knowledge or no knowledge on the part of the defendant." Id. at 4 (quoting Rivera, 944 F.2d at 1570-71). In response, the Government argues that the instruction was proper precisely because there was no direct evidence demonstrating that Estrada was explicitly told that the funds involved were drug proceeds, but the Government presented enough circumstantial evidence to suggest that he was aware of a high probability of that fact and deliberately avoided learning the truth. See New Trial Response at 8-9. In support of its argument, the Government argues that the Eleventh Circuit has approved the use of this

---

[13]     The Court previously concluded that Estrada did not need to know that the money was specifically represented as coming from the sale of MDMA, as long as he believed it to come from another specified unlawful activity, here the sale of marijuana. See supra § II(A)(2)(a) at 7-11.

instruction where "the evidence supports both actual knowledge and deliberate ignorance." Id. at 8 (citing United States v. Morales de Carty, 300 Fed. Appx. 820, 829 (11th Cir. 2008)) (citation omitted).

Eleventh Circuit precedent regarding the use of the deliberate ignorance jury instruction is well-developed. In Rivera, the court discussed the rationale behind the use of the instruction as follows:

> The deliberate ignorance instruction is based on the alternative to the actual knowledge requirement at common law that "'if a party has his suspicion aroused but then deliberately omits to make further enquiries, because he wishes to remain in ignorance, he is deemed to have knowledge.'" It is premised on the belief that acts conducted under the guise of deliberate ignorance and acts committed with positive knowledge are equally culpable. "To act 'knowingly,' therefore, is not necessarily to act only with positive knowledge, but also to act with an awareness of the high probability of the existence of the fact in question."

Id. at 1570. Following this reasoning, the court concluded that the instruction is warranted in cases where the evidence is sufficient to support the inference that the defendant "was aware of the high probability of the existence of the fact in question and purposely contrived to avoid learning all of the facts" necessary to obtain positive knowledge. Id. at 1571 (citing United States v. Alvarado, 838 F.2d 311, 314 (9th Cir. 1987)). Indeed, as noted by the Government, the Circuit Court has repeatedly confirmed that the instruction is proper where "the evidence supports both actual knowledge and deliberate ignorance." See Morales de Carty, 300 Fed. Appx. at 829 (quoting Arias, 984 F.2d at 1143).

In considering whether the inclusion of a deliberate ignorance instruction was appropriate in this case, a comparison of two Eleventh Circuit cases with substantially similar fact patterns – one where the instruction was later deemed to be given in error, and one where it was not – is instructive. In Rivera, the defendants returned to the United

States from Colombia with suitcases containing cocaine. See id. at 1565. At trial, the district court instructed the jury on deliberate ignorance, and the defendants objected. Id. at 1572. On appeal, the court concluded that the instruction had been given in error because "there was no suggestion that the defendants had come into possession of their suitcases under suspicious circumstances." Id. As a result, the only possible conclusions were that the defendants had actual knowledge, or no knowledge, of the cocaine in their suitcases. Id. In contrast, in Morales de Carty, the defendants returned to the United States from the Dominican Republic with suitcases containing heroin hidden in pairs of jeans. See id. at 822-23. In that case, the defendants admitted in separate post-arrest interviews to being approached by a man who paid for their return flights in exchange for transporting the jeans to the United States. See id. at 823-24. Again, at trial, over defense objection, the district court instructed the jury on deliberate ignorance. Id. at 828. On appeal, the court determined that the instruction was proper because the record evidence "cut both ways" – the defendants denied knowledge of the heroin, but "neither questioned why a man would buy them [expensive] airline tickets [] in exchange for carrying a few pairs of jeans to the United States." Id. at 829. In sum, the key difference between these two cases, and that which ultimately justified the use of the deliberate ignorance instruction, was the presence of suspicious circumstances in the latter.

In this case, the Government presented evidence that Estrada either actually knew that drug sales were the source of the laundered funds, or that he was aware of a high probability of the source and purposefully contrived to avoid confirming his suspicions. At the time Rodriguez approached Estrada and told him "that [he] need [sic] to make this cash usable, you know, legal," Estrada was already aware that Rodriguez was receiving

- 26 -

shipments of marijuana, and that Rodriguez and other co-conspirators were engaging in "bad business" involving illegal drugs – including both marijuana and ecstasy.  <u>See</u> Tr. Vol. I at 47.   Indeed, on the way to the bank to retrieve the money, Rodriguez again told Estrada that he needed "to get this money legally . . . because . . . [he] couldn't get it out [otherwise]."  Tr. Vol. I. at 50.  Then, after his arrest, Estrada affirmed – in response to questioning by federal agents – that assisting Rodriguez with the transaction at issue made him uncomfortable, <u>see</u> Estrada Interview at 7-8, and that it was not normal to be asked to hold over $40,000 for a friend, <u>see id.</u> at 10.  Nevertheless, Estrada took the money, deposited it into his own corporate bank account, and later returned it to Rodriguez that same day in the form of a cashier's check.  <u>See id.</u> at 8.  At trial, Estrada asserted that he did not know Rodriguez was a drug dealer.  In other words, he relied on a lack of guilty knowledge in the face of these suspicious circumstances.  Hence, the Court has concluded that the evidence was sufficient to support an inference of deliberate ignorance and, consequently, that the instruction was properly given.  Thus, based on a comprehensive review of the record, the Court has found that Estrada's New Trial Motion is denied.

## III.    Conclusion

In the Motions, Estrada seeks a new trial or entry of a judgment of acquittal.  For the reasons set forth more fully above, the Court has found that the arguments presented in Estrada's Motions do not warrant the requested relief.

**DONE AND ORDERED** at Jacksonville, Florida on May 3, 2017.

MARCIA MORALES HOWARD
United States District Judge

lc24

Copies to:

Counsel of Record